UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>  *ex rel.*<br>Matthew MacDowell<br>4946 Sheridan Ave. South<br>Minneapolis, MN 55410<br><br>       Plaintiffs,<br><br>vs.<br><br>A&T MARKETING, INC., APRISA<br>TECHNOLOGY LLC, CAPITOL SUPPLY,<br>INC., CDW GOVERNMENT LLC, DELL<br>MARKETING L.P., ELLISON SYSTEMS,<br>INC., EN POINTE GOV, INC., GOV<br>CONNECTION, INC., GTSI CORP., INSIGHT<br>PUBLIC SECTOR, INC., KPAUL<br>PROPERTIES, LLC, NEW TECH<br>SOLUTIONS, INC., OFFICEMAX<br>INCORPORATED, PC MALL GOV, INC.,<br>SYNNEX CORPORATION, UNISTAR-<br>SPARCO COMPUTERS, INC.and WECSYS<br>LLC<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No.<br><br>COMPLAINT FOR VIOLATION<br>OF THE FALSE CLAIMS ACT<br><br>JURY TRIAL DEMAND<br><br>**[FILED IN CAMERA AND UNDER<br>SEAL Pursuant to 31 U.S.C. §§ 3730<br>(b)(2)]** |

## **COMPLAINT**

*Qui Tam* Plaintiff Matthew MacDowell, by and through his attorneys, bring this

complaint on behalf of the United States pursuant to 31 U.S.C. § 3730, as follows:

## **I.**
## **INTRODUCTION**

1.    This is an action by qui tam plaintiff Matthew MacDowell, on behalf of the

United States, against A&T Marketing, Inc., Aprisa Technology LLC, Capitol Supply, Inc., CDW Government LLC, Dell Marketing L.P., Ellison Systems, Inc., En Pointe Gov, Inc., Gov Connection, Inc., GTSI Corp., Insight Public Sector, Inc., KPaul Properties, LLC, New Tech Solutions, Inc., Officemax Incorporated, PC Mall Gov, Inc., Synnex Corporation, Unistar-Sparco Computers, Inc. and, Wecsys LLC for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").

2.      The claims against these seventeen defendants are based on false claims the defendants knowingly submitted or caused to be submitted to the United States in connection with the sale of certain products made in China and the Philippines to Federal agencies pursuant to Multiple Award Schedule (MAS) Schedule 70 and Schedule 75 Contracts with the General Services Administration (GSA), an agency of the United States headquartered in Washington, D.C.

3.      Through the MAS program, GSA streamlines the process by which Federal agencies and other GSA authorized purchasers can buy commercial goods and services. It does so by negotiating and entering into long-term, Government-wide indefinite quantity contracts with multiple vendors selling comparable products at varying prices. GSA publishes these contracts in catalogs commonly referred to as "federal supply schedules" or "schedules." There are more than 100 different schedules covering various products and services. Federal agencies and other GSA authorized purchasers can purchase products directly with vendors listed on the GSA schedules without having to separately contract for such goods and services. Such purchases can be made through "GSA Advantage!," GSA's internet based procurement portal, through the vendors' own websites, or by other means including phone and facsimile orders.

4.      In exchange for an opportunity to gain access to the broad Government marketplace and the ease of administration that comes from selling to hundreds of Government end users under one central contract, participating vendors agree to abide by all contract terms and conditions when selling to Federal agency purchasers under the MAS contract. A material

requirement of all GSA MAS Schedule 70 and Schedule 75 Contracts, including defendants' contracts, is compliance with the Trade Agreements Act ("TAA"), 19 U.S.C. § 2501 *et seq.* , and its related regulations. The TAA requires that all products sold to the United States Government be manufactured in one of a list of designated countries deemed to trade fairly with the United States.

5.     Each of the defendant companies entered into an MAS contract with GSA for the sale of particular office equipment products. At the time of contract award and on occasions thereafter, each of the defendant companies agreed that it would sell to the United States Government only end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China and the Philippines. But in fact, over the course of their respective GSA MAS Schedule 70 and Schedule 75 Contracts, the defendants knowingly offered for sale to Federal agency customers through the federal supply schedule hundreds of electric power supply products from American Power Conversion (APC") that were manufactured in China and the Philippines, which is a non-designated country, and sold and knowingly submitted invoices for payment to Federal agencies for these non-TAA compliant products. Despite each defendant's false certification that the products at issue were made in a TAA compliant country, the APC products are obviously made in China or the Philippines or other non-designated countries. In fact, each non-TAA compliant APC product bears the label of the country of manufacture, such as the following "Product of China" or "Made in Philippines" insignia examples from APC products:




6.     Each of these seventeen defendants purchased these China and Philippines

products either directly from APC, or through distribution originated by APC.  Each defendant was on notice that APC did not represent these products were from a TAA compliant country. Each defendant was on notice of the above "Product of China" and "Made in Philippines" insignia on the products listed and sold through their respective GSA schedules..  Each defendant made the same false certification on its FAR 52.225-6 Trade Agreements Certificate that each APC product, was "*a U.S.-made or designated country end product as defined in the clause of this solicitation entitled 'Trade Agreements.*'" Each of these false certifications was in violation of 48 CFR 52-225-6 (a).

7.    There are many honest companies (such as Staples, Office Depot, Cannon USA and others) which have refused to list and sell APC products through their own GSA schedule contracts, opting instead to do what they are legally required to do: only list and sell competing products manufactured in the United States and TAA compliant countries.  For these honest companies to have to try to compete with these seventeen dishonest defendants undermines not only the purpose of the TAA, but also takes jobs away from American and fair trading partner workers.

8.    Each of the invoices submitted by the defendants for these TAA non-compliant APC products was a false claim to which defendants were not entitled to be paid. As a result of these actions by defendants, the United States paid false claims for millions of dollars of non-compliant products that it would not have paid had it known that the products originated in non-designated countries.

## II.
## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3729-3730, and 3732(a).  Further, there has been no prior public disclosure of the allegations or transactions stated herein. If such a disclosure has occurred, the *qui tam* plaintiff is an original source of the information.

10.     Venue is proper in this district under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a). Each of the defendants has transacted business with Federal customers within this district and has otherwise purposefully availed itself of the privilege of conducting activities in this district by contracting with the General Services Administration (GSA) to offer office equipment products for sale to Federal customers in this district through "GSA Advantage!."

## III.
## PARTIES

11.     Relator Matthew MacDowell is an individual and a resident of the State of Minnesota.  Mr. MacDowell worked for a competitor to these defendants, which also sold electronic products through the GSA portal.  A major part of Mr. MacDowell's job duties was to track the bids and contracts of each of these defendants in the contracting process for selling APC products to various federal agencies.  Through his job duties, Mr. MacDowell saw that each of these defendants was being awarded major sales contracts with federal agencies for the sale of the non-TAA compliant APC products in question.  By following these defendants' sales contract activities, Mr. MacDowell witnessed that each was selling non-TAA compliant APC products to federal agencies through the GSA portal that were falsely represented as being TAA compliant.

12.     Defendant A&T Marketing, Inc. is located in Columbia, Maryland and is engaged in the business of selling office equipment products to the Federal Government and other customers.  Under its GSA Contract number GS-35F0519J, A&T Marketing, Inc. sold schedule 70 and schedule 75 goods to the United States Government totaling $7,174,525 in 2011.

13.     Defendant Aprisa Technology LLC is located in Roslyn, New York and is engaged in the business of selling office equipment products to the Federal Government and other customers.  During the past three years under its GSA Contract number GS-02F0182R, Aprisa Technology LLC sold schedule 70 and schedule 75 goods to the United States Government totaling $6,284,826 in 2009, $6,996,112 in 2010 and $7,311,666 in 2011.

14.     Defendant Capitol Supply, Inc. is located in Sunrise, Florida and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-27F3042D, Capitol Supply, Inc. sold schedule 70 and 75 goods to the United States Government totaling $10,147,994 in 2009, $13,714,253 in 2010 and $45,788,457 in 2011.

15.     Defendant CDW Government LLC is located in Vernon Hills, Illinois and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS35F0195J, CDW Government LLC sold schedule 70 goods to the United States Government totaling $147,133,358 in 2009, $161,946 in 2010 and $150,171,148 in 2011.

16.     Defendant Dell Marketing L.P. is located in Round Rock, Texas and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-35F-4076D, Dell Marketing L.P. sold schedule 70 goods to the United States Government totaling $1,001,243,349 in 2009, $967,697,822 in 2010 and $776,814,716 in 2011.

17.     Defendant Ellison Systems, Inc. is located in New York, New York and is engaged in the business of selling office equipment products to the Federal Government and other customers. Under its Contract number GS-02F-0141P, Ellison Systems, Inc. sold schedule 70 and 75 goods to the United States Government totaling $5,925,959 in 2011.

18.     Defendant En Pointe Gov, Inc. is located in Gardena, California and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-35F0372N, En Pointe Gov, Inc. sold schedule 70 goods to the United States Government totaling $4,492,395 in 2009, $3,211,660 in 2010 and $5,842,899 in 2011.

19.     Defendant Gov Connection, Inc. is located in Rockville, Maryland and is engaged

6

in the business of selling office equipment products to the Federal Government and other customers.  During the past three years under its GSA Contract number GS-35F0750P, Gov Connection, Inc. sold schedule 70 goods to the United States Government totaling $11,216,333 in 2009, $20,754,582 in 2010 and $21,853,426 in 2011.

20.     Defendant GTSI Corp. is located in Herndon, Virginia and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-35F4120D, GTSI Corp. sold schedule 70 goods to the United States Government totaling $96,363,807 in 2009, $63,308,596 in 2010 and $69,467,539 in 2011.

21.     Defendant Insight Public Sector, Inc. is located in Chantilly, Virginia and is engaged in the business of selling office equipment products to the Federal Government and other customers.  During the past three years under its GSA Contract number GS-35F4044D, Insight Public Sector, Inc. sold schedule 70 goods to the United States Government totaling $157,331,383 in 2009, $153,292,015 in 2010 and $133,227,865 in 2011.

22.     Defendant KPaul Properties, LLC is located in Indianapolis, Indiana and is engaged in the business of selling office equipment products to the Federal Government and other customers.  During the past three years under its GSA Contract number GS-21F0095U, KPaul Properties, LLC sold schedule 70 and schedule 75 goods to the United States Government totaling $ 6,611,649 in 2009, $10,424,352 in 2010 and $6,620,391 in 2011.

23.     Defendant New Tech Solutions, Inc. is located in Fremont, California and is engaged in the business of selling office equipment products to the Federal Government and other customers.  During the past three years under its GSA Contract number GS-35F0791N, New Tech Solutions, Inc. sold schedule 70 goods to the United States Government totaling $3,306,412 in 2009, $3,379,270 in 2010 and $4,960,595 in 2011.

24.     Defendant Officemax Incorporated is located in Elkridge, Maryland and is

engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-14F0035K , Officemax Incorporated sold schedule 70 and schedule 75 goods to the United States Government totaling $55,051,807 in 2009, $48,049,783 in 2010 and $31,965,872 in 2011.

25.     Defendant PC Mall Gov, Inc. is located in Chantilly, Virginia and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-35F5946H, PC Mall Gov, Inc. sold schedule 70 goods to the United States Government totaling $12,495,044 in 2009, $17,084,656 in 2010 and $14,680,381 in 2011.

26.     Defendant Synnex Corporation is located in Greenville, South Carolina and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-35F0143R, Synnex Corporation sold schedule 70 goods to the United States Government totaling $66,522,386 in 2009, $56,665,431 in 2010 and $54,686,113 in 2011.

27.     Defendant Unistar-Sparco Computers, Inc. is located in Millington, Tennessee and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-35F0218M, Unistar-Sparco Computers, Inc. sold schedule 70 and schedule 75 goods to the United States Government totaling $9,629,723 in 2009, $13,148,774 in 2010 and $7,048,095 in 2011.

28.     Defendant Wecsys LLC is located in Brooklyn Park, Minnesota and is engaged in the business of selling office equipment products to the Federal Government and other customers. During the past three years under its GSA Contract number GS-14F0039L, Wecsys LLC sold schedule 70 and schedule 75 goods to the United States Government totaling $11,168,284 in 2009, $11,714,340 in 2010 and $23,277,240 in 2011.

## IV.
## STATUTORY SCHEME

29.     For false claims prior to May 20, 2009, the false claims provisions of the False Claims Act provide in pertinent part that a person is liable to the United States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government. . . a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved . . . ." is liable to the United States Government. *See* 31 U.S.C. § 3729(a)(1) and (2).

30.     For violations occurring on or after May 20, 2009, the FCA, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides in pertinent part that any person who "knowingly presents, or causes to be presented. . . a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." shall be liable to the United States Government. *See* 31 U.S.C. § 3729(a)(1)(A) and (B).

31.     The FCA defines the terms "knowing" and "knowingly" to mean that a person with respect to information (a) "has actual knowledge of the information"; (b) "acts in deliberate ignorance of the truth or falsity of the information"; or (c) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b); 31 U.S.C. §3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b); 31 U.S.C. §3729(b)(1)(B) (2009).

## V.
## GENERAL ALLEGATIONS AS TO ALL DEFENDANTS

32.     The MAS contracts at issue are Schedule 70 (Computer and Electronics) and Schedule 75 (Office Products) contracts through which vendors can sell their products to numerous Federal Government agencies.

33.     As described below, each of the defendant companies entered into a MAS Schedule

9

70 Contract and/or Schedule 75 Contract with GSA that allowed it to offer and sell office products to Federal agencies and other authorized GSA purchasers directly through GSA's web portal, GSA Advantage!, through its own website, and through other means.

34.     All of these GSA MAS Schedule 70 and Schedule 75 Contracts expressly incorporate and are subject to the requirements of the Trade Agreements Act ("TAA"), 19 U.S.C. § 2501 *et seq.,* and its related regulations. The TAA requires that all products sold to the United States Government be manufactured in one of a list of designated countries deemed to trade fairly with the United States. *See* FAR 52.225-5 ("Trade Agreements Clause" or "TAA Clause"); *see also* FAR 25.003. The Trade Agreements Clause incorporated into each of defendants' MAS contracts specifies the "designated countr[ies]" whose "end products" may be offered for sale under MAS Schedule 70 and Schedule 75 Contracts.

35.     This incorporation is accomplished via explicit reference in the contract to 48 CFR § 52.225-5 and 52.225-6.   Federal Acquisition Regulation (FAR) Section 52.225-5 identifies certain "designated countries" under the WTO GPA and provides that a contractor is prohibited from delivering products under the contract that are not exclusively made (or substantially transformed) in the United States or one of the designated countries.  The products at issue in the defendants' false claims were made, by way of example, in China and the Philippines, which are not TAA designated countries.  Further, the dollar size of the defendants' contracts makes the products sold through those contracts subject to being TAA compliant.[1]

---

[1]   48 C.F.R. sec. 25.403(b)(3), which governs the applicability of the TAA, states "if, in any 12-month period, recurring or multiple awards for the same type of product or products are anticipated, use the total estimated value of these projected awards to determine whether [the TAA] applies."  Accordingly, if in any 12-month period the anticipated value of all sales under the GSA Schedule contract by a particular contract holder exceeds the threshold amount set forth in prescription regulation 48 C.F.R. sec. 25.1101 (currently $203,000), the TAA applies to all sales under the GSA Schedule contract, regardless of the value of each individual sale.  In this case, the total anticipated value of all sales by each defendant company to the Federal Government pursuant to each such defendant company's GSA Schedule contract far exceeded the relevant threshold for each year, and therefore the TAA applied to all sales under each

36.     GSA does not permit products from non-designated countries to be offered for sale on the GSA Advantage! website.  GSA requires vendors to specifically list all products for sale and their countries of origin before the products can be approved for sale on the GSA Advantage! website.  These requirements are mandatory for all vendors who seek to do business with the GSA, including the defendants named herein.

37.     FAR 52.225-6, the Trade Agreements Certificate, further requires prospective GSA Schedule contractors to "certif[y] that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product as defined in the clause of this solicitation entitled 'Trade Agreements.'" 48 CFR 52-225-6 (a).  Under subsection (b), the contractor must also list with particularity all of those end products that are not U.S.-made and/or were not produced in a designated country.  See FAR 52.212-3(f)(2), Offeror Representations and Certifications - Commercial Items; *see also* GSA Advantage Vendor FAQ.  Any item not identified as from other than a designated country is presumed by GSA to be compliant with the Trade Agreement clause of the contract.  GSA Advantage FAQ.

38.     Prospective contractors are required to take these steps <u>before</u> a Schedule contract is awarded and <u>before</u> any products are uploaded into the GSA Advantage! system and made available for sale to Government purchasers.  Accordingly, if a contractor is being accurate and honest in its pre-contract disclosures and certifications, the <u>only</u> end products that should appear for sale in the GSAAdvantage! System for sale under the GSA Schedule contract are those end products that the contractor has previously expressly represented are TAA compliant.

39.     So that it could list these products on the GSA schedule, at the time of contract award and on occasions thereafter, each defendant company agreed that, pursuant to its respective GSA MAS Schedule 70 and Schedule 75 Contract, it would sell to the United States Government only end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

40.     Compliance with the TAA is material to payment under MAS Schedule 70 and Schedule 75 contracts.  In fact, compliance with the TAA is a pre-condition that the United States places on claims for reimbursement for sales made under the GSA Schedule contract program.  As discussed above, the TAA was enacted and incorporated into GSA Schedule

defendant's contract for each year.

contracts for the express purpose of promoting the United States' trade interests. For this reason, GSA requires its Schedule contractors to make express representations about the country or countries of origin of each individual end product <u>before</u> those end products can be made available for sale to Government purchasers. Absent those representations, a contractor is unable to even have its products listed for sale. Thus, when a contractor makes false representations about the country of origin of non-compliant products in order to get such products listed for sale, it has violated a core pre-condition of the GSA Schedule program.

**VI.**

**A&T MARKETING, INC.**

41.      Defendant A&T Marketing, Inc. entered into a MAS contract with GSA, contract number GS-35F0519J, in 1992 ("A&T Marketing's MAS Contract").

42.      A&T Marketing's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of A&T Marketing's MAS Contract with GSA, A&T Marketing, Inc. was required to comply with the TAA.

43.      At the time of contract award and on occasions thereafter, A&T Marketing, Inc. agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

44.      Pursuant to A&T Marketing's MAS Contract, between at least 2002 and the present, and continuing, A&T Marketing, Inc. offered for sale a number of office products to United States agencies via GSA Advantage! website, A&T Marketing's own website, and by other means.

45.      A&T Marketing, Inc. falsely represented on the GSA Advantage! that the items offered for sale by A&T Marketing, Inc. to United States agencies under United Office Solutions' MAS Contract were TAA compliant products. A&T Marketing, Inc. knew these representations were false. A&T Marketing, Inc. either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin. Additionally, each of the products at issue and sold by the A&T Marketing, Inc. bears the insignia "Product of China"or "Made in Philippines" or a label from another non-TAA country. If A&T Marketing, Inc. had looked into the issue before

12

falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant. As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which A&T Marketing, Inc. falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 1 (incorporated herein by reference).

46.     Between at least 2002 and the present, and continuing, approximately five hundred ninety two (592) APC products offered on the GSA Advantage! website and on A&T Marketing's own website for sale by A&T Marketing, Inc. to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products. Examples of these non-TAA compliant products are included in Exhibit 1.

47.     Between at least 2002 and the present, A&T Marketing, Inc. entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, A&T Marketing's own website, and by other means, all in violation of the TAA and the TAA Clause in A&T Marketing's MAS Contract.

48.     Had A&T Marketing, Inc. provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under A&T Marketing's MAS Contract would not have occurred.

## VII.

## APRISA TECHNOLOGY LLC.

49.     Defendant Aprisa Technology LLC entered into a MAS contract with GSA, contract number GS-02F0182R, in 2002 ("Aprisa Technology's MAS Contract").

50.     Aprisa Technology's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Aprisa Technology's MAS Contract with GSA, Aprisa Technology was required to comply with the TAA.

51.     At the time of contract award and on occasions thereafter, Aprisa Technology agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that

originated in non-designated countries such as China or the Philippines.

52.     Pursuant to Aprisa Technology's MAS Contract, between 2002 and the present, and continuing, Aprisa Technology offered for sale a number of office products to United States agencies via GSA Advantage! website, Aprisa Technology's own website, and by other means.

53.     Aprisa Technology falsely represented on the GSA Advantage! that the items offered for sale by Aprisa Technology to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  Aprisa Technology knew these representations were false. Aprisa Technology either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the Aprisa Technology bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country.  If Aprisa Technology had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which Aprisa Technology falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 2 (incorporated herein by reference).

54.     Between 2002 and the present, and continuing, approximately four hundred forty three (443) APC products offered on the GSA Advantage! website and on Aprisa Technology's own website for sale by Aprisa Technology to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 2.

55.     Between 2002 and the present, Aprisa Technology entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Aprisa Technology's own website, and by other means, all in violation of the TAA and the TAA Clause in Aprisa Technology's MAS Contract.

56.     Had Aprisa Technology provided accurate information about the countries of origin

14

of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Aprisa Technology's MAS Contract would not have occurred.

**VIII.**

**<u>CAPITOL SUPPLY, INC.</u>**

57.     Defendant Capitol Supply, Inc. entered into a MAS contract with GSA, contract number GS-27F3042D, in 1983 ("Capitol Supply's MAS Contract").

58.     Capitol Supply's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Capitol Supply's MAS Contract with GSA, Capitol Supply was required to comply with the TAA.

59.     At the time of contract award and on occasions thereafter, Capitol Supply agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

60.     Pursuant to Capitol Supply's MAS Contract, between at least 2002 and the present, and continuing, Capitol Supply offered for sale a number of office products to United States agencies via GSA Advantage! website, Capitol Supply's own website, and by other means.

61.     Capitol Supply falsely represented on the GSA Advantage! that the items offered for sale by Capitol Supply to United States agencies under United Office Solutions' MAS Contract were TAA compliant products. Capitol Supply knew these representations were false. Capitol Supply either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin. Additionally, each of the products at issue and sold by the Capitol Supply bears the insignia "Product of China" or "Made in Philippines." If Capitol Supply had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant. As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which Capitol Supply falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 3

15

(incorporated herein by reference).

62.     Between at least 2002 and the present, and continuing, approximately one hundred seventy one (171) APC products offered on the GSA Advantage! website and on Capitol Supply's own website for sale by Capitol Supply to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 3.

63.     Between at least 2002 and the present, Capitol Supply entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Capitol Supply's own website, and by other means, all in violation of the TAA and the TAA Clause in Capitol Supply's MAS Contract.

64.     Had Capitol Supply provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Capitol Supply's MAS Contract would not have occurred.

## IX.

## CDW GOVERNMENT LLC

65.     Defendant CDW Government LLC  ("CDW") entered into a MAS contract with GSA, contract number GS35F0195J, in 1998 ("CDW's MAS Contract").

66.     CDW's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of CDW'sMAS Contract with GSA, CDW was required to comply with the TAA.

67.     At the time of contract award and on occasions thereafter, CDW agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

68.     Pursuant to CDW's MAS Contract, between at least 2002 and the present, and continuing, CDW offered for sale a number of office products to United States agencies via GSA Advantage! website, CDW's own website, and by other means.

69.     CDW falsely represented on the GSA Advantage! that the items offered for sale by CDW to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  CDW knew these representations were false.  CDW either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the CDW bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If CDW had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which CDW falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 4 (incorporated herein by reference).

70.     Between at least 2002 and the present, and continuing, approximately forty six (46) APC products offered on the GSA Advantage! website and on CDW's own website for sale by CDW to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 4.

71.     Between at least 2002 and the present, CDW entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, CDW's own website, and by other means, all in violation of the TAA and the TAA Clause in CDW's MAS Contract.

72.     Had CDW provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under CDW's MAS Contract would not have occurred.

## X.

## **DELL MARKETING L.P.**

73.     Defendant Dell Marketing L.P. ("Dell") entered into a MAS contract with GSA, contract number GS-35F-4076D, in 1987 ("Dell's MAS Contract").

74.     Dell's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Dell'sMAS Contract with GSA, Dell was required to comply with the TAA.

75.     At the time of contract award and on occasions thereafter, Dell agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

76.     Pursuant to Dell's MAS Contract, between at least 2002 and the present, and continuing, Dell offered for sale a number of office products to United States agencies via GSA Advantage! website, Dell's own website, and by other means.

77.     Dell falsely represented on the GSA Advantage! that the items offered for sale by Dell to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  Dell knew these representations were false.  Dell either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the Dell bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If Dell had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which Dell falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 5 (incorporated herein by reference).

78.     Between at least 2002 and the present, and continuing, approximately twenty seven (27) APC products offered on the GSA Advantage! website and on Dell's own website for sale by Dell to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 5.

79.     Between at least 2002 and the present, Dell entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Dell's own website, and by other means, all in violation of the TAA and the TAA Clause in Dell's MAS Contract.

80.     Had Dell provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Dell's MAS Contract would not have occurred.

## XI.

## ELLISON SYSTEMS, INC.

81.     Defendant Ellison Systems, Inc. ("Ellison") entered into a MAS contract with GSA, contract number GS-02F-0141P, in 1994 ("Ellison's MAS Contract").

82.     Ellison's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Ellison's MAS Contract with GSA, Ellison was required to comply with the TAA.

83.     At the time of contract award and on occasions thereafter, Ellison agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

84.     Pursuant to Ellison's MAS Contract, between at least 2002 and the present, and continuing, Ellison offered for sale a number of office products to United States agencies via GSA Advantage! website, Ellison's own website, and by other means.

85.     Ellison falsely represented on the GSA Advantage! that the items offered for sale by Ellison to United States agencies under United Office Solutions' MAS Contract were TAA compliant products. Ellison knew these representations were false. Ellison either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin. Additionally, each of the products at issue and sold by the Ellison bears the insignia "Product

of China" or "Made in Philippines" or a label from another non-TAA country. If Ellison had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which Ellison falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 6 (incorporated herein by reference).

86.    Between at least 2002 and the present, and continuing, approximately two hundred sixty five (265) APC products offered on the GSA Advantage! website and on Ellison's own website for sale by Ellison to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 6.

87.    Between at least 2002 and the present, Ellison entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Ellison's own website, and by other means, all in violation of the TAA and the TAA Clause in Ellison's MAS Contract.

88.    Had Ellison provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Ellison's MAS Contract would not have occurred.

## XII.

## EN POINTE GOV, INC.

89.    Defendant En Pointe Gov, Inc. ("En Pointe") entered into a MAS contract with GSA, contract number GS-35F0372N, in 2000 ("En Pointe's MAS Contract").

90.    En Pointe's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of En Pointe'sMAS Contract with GSA, En Pointe was required to comply with the TAA.

91.    At the time of contract award and on occasions thereafter, En Pointe agreed that, under its MAS Contract, it would only sell to the United States Government end products that

originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

92.     Pursuant to En Pointe's MAS Contract, between at least 2002 and the present, and continuing, En Pointe offered for sale a number of office products to United States agencies via GSA Advantage! website, En Pointe's own website, and by other means.

93.     En Pointe falsely represented on the GSA Advantage! that the items offered for sale by En Pointe to United States agencies under United Office Solutions' MAS Contract were TAA compliant products. En Pointe knew these representations were false. En Pointe either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin. Additionally, each of the products at issue and sold by the En Pointe bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If En Pointe had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant. As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which En Pointe falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 7 (incorporated herein by reference).

94.     Between at least 2002 and the present, and continuing, approximately fourteen (14) APC products offered on the GSA Advantage! website and on En Pointe's own website for sale by En Pointe to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products. Examples of these non-TAA compliant products are included in Exhibit 7.

95.     Between at least 2002 and the present, En Pointe entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, En Pointe's own website, and by other means, all in violation of the TAA and the TAA Clause in En Pointe's MAS Contract.

96.     Had En Pointe provided accurate information about the countries of origin of these

noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under En Pointe's MAS Contract would not have occurred.

## XIII.
## GOV CONNECTION, INC.

97.     Defendant Gov Connection, Inc. ("Gov Connection") entered into a MAS contract with GSA, contract number GS-35F0750P, in 1994 ("Gov Connection's MAS Contract").

98.     Gov Connection's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Gov Connection's MAS Contract with GSA, Gov Connection was required to comply with the TAA.

99.     At the time of contract award and on occasions thereafter, Gov Connection agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

100.     Pursuant to Gov Connection's MAS Contract, between at least 2002 and the present, and continuing, Gov Connection offered for sale a number of office products to United States agencies via GSA Advantage! website, Gov Connection's own website, and by other means.

101.     Gov Connection falsely represented on the GSA Advantage! that the items offered for sale by Gov Connection to United States agencies under United Office Solutions' MAS Contract were TAA compliant products. Gov Connection knew these representations were false. Gov Connection either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin. Additionally, each of the products at issue and sold by the Gov Connection bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If Gov Connection had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant. As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC

22

products for which Gov Connection falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 8 (incorporated herein by reference).

102.    Between at least 2002 and the present, and continuing, approximately twenty six (26) APC products offered on the GSA Advantage! website and on Gov Connection's own website for sale by Gov Connection to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 8.

103.    Between at least 2002 and the present, Gov Connection entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Gov Connection's own website, and by other means, all in violation of the TAA and the TAA Clause in Gov Connection's MAS Contract.

104.    Had Gov Connection provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Gov Connection's MAS Contract would not have occurred.

### XIV.

### GTSI CORP.

105.    Defendant GTSI Corp. ("GTSI") entered into a MAS contract with GSA, contract number GS-35F4120D, in 1983 ("GTSI's MAS Contract").

106.    GTSI's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of GTSI's MAS Contract with GSA, GTSI was required to comply with the TAA.

107.    At the time of contract award and on occasions thereafter, GTSI agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

108.    Pursuant to GTSI's MAS Contract, between at least 2002 and the present, and continuing, GTSI offered for sale a number of office products to United States agencies via GSA

23

Advantage! website, GTSI's own website, and by other means.

109.    GTSI falsely represented on the GSA Advantage! that the items offered for sale by GTSI to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  GTSI knew these representations were false.  GTSI either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the GTSI bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If GTSI had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which GTSI falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 9 (incorporated herein by reference).

110.    Between at least 2002 and the present, and continuing, approximately forty nine (49) APC products offered on the GSA Advantage! website and on GTSI's own website for sale by GTSI to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 9.

111.    Between at least 2002 and the present, GTSI entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, GTSI's own website, and by other means, all in violation of the TAA and the TAA Clause in GTSI's MAS Contract.

112.    Had GTSI provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under GTSI's MAS Contract would not have occurred.

## XV.

## INSIGHT PUBLIC SECTOR, INC.

113.     Defendant Insight Public Sector, Inc. ("Insight Public Sector") entered into a MAS contract with GSA, contract number GS-35F4044D, in 1994 ("Insight Public Sector's MAS Contract").

114.     Insight Public Sector's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Insight Public Sector's MAS Contract with GSA, Insight Public Sector was required to comply with the TAA.

115.     At the time of contract award and on occasions thereafter, Insight Public Sector agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

116.     Pursuant to Insight Public Sector's MAS Contract, between at least 2002 and the present, and continuing, Insight Public Sector offered for sale a number of office products to United States agencies via GSA Advantage! website, Insight Public Sector's own website, and by other means.

117.     Insight Public Sector falsely represented on the GSA Advantage! that the items offered for sale by Insight Public Sector to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  Insight Public Sector knew these representations were false.  Insight Public Sector either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the Insight Public Sector bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If Insight Public Sector had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which Insight Public Sector falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 10 (incorporated herein by reference).

118.     Between at least 2002 and the present, and continuing, approximately twenty one

(21) APC products offered on the GSA Advantage! website and on Insight Public Sector's own website for sale by Insight Public Sector to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 10.

119.   Between at least 2002 and the present, Insight Public Sector entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Insight Public Sector's own website, and by other means, all in violation of the TAA and the TAA Clause in Insight Public Sector's MAS Contract.

120.   Had Insight Public Sector provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Insight Public Sector's MAS Contract would not have occurred.

## XVI.

## KPAUL PROPERTIES, LLC

121.   Defendant KPaul Properties, LLC ("KPaul") entered into a MAS contract with GSA, contract number GS-21F0095U, in 2006 ("KPaul's MAS Contract").

122.   KPaul's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of KPaul's MAS Contract with GSA, KPaul was required to comply with the TAA.

123.   At the time of contract award and on occasions thereafter, KPaul agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

124.   Pursuant to KPaul's MAS Contract, between 2006 and the present, and continuing, KPaul offered for sale a number of office products to United States agencies via GSA Advantage! website, KPaul's own website, and by other means.

125.   KPaul falsely represented on the GSA Advantage! that the items offered for sale by KPaul to United States agencies under United Office Solutions' MAS Contract were TAA compliant

products.  KPaul knew these representations were false.  KPaul either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the KPaul bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If KPaul had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which KPaul falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 11 (incorporated herein by reference).

126.    Between 2006 and the present, and continuing, approximately five hundred three (503) APC products offered on the GSA Advantage! website and on KPaul's own website for sale by KPaul to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 11.

127.    Between 2006 and the present, KPaul entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, KPaul's own website, and by other means, all in violation of the TAA and the TAA Clause in KPaul's MAS Contract.

128.    Had KPaul provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under KPaul's MAS Contract would not have occurred.

## XVII.

## NEW TECH SOLUTIONS, INC.

129.    Defendant New Tech Solutions, Inc. ("New Tech") entered into a MAS contract with GSA, contract number GS-35F0791N, in 1997 ("New Tech's MAS Contract").

130.    New Tech's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of New Tech's MAS Contract with GSA, New Tech was required to comply with the TAA.

131.    At the time of contract award and on occasions thereafter, A&T Marketing, Inc. agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

132.    Pursuant to New Tech's MAS Contract, between at least 2002 and the present, and continuing, New Tech offered for sale a number of office products to United States agencies via GSA Advantage! website, New Tech's own website, and by other means.

133.    New Tech falsely represented on the GSA Advantage! that the items offered for sale by New Tech to United States agencies under United Office Solutions' MAS Contract were TAA compliant products. New Tech knew these representations were false. New Tech either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin. Additionally, each of the products at issue and sold by the New Tech bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If New Tech had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant. As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which New Tech falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 12 (incorporated herein by reference).

134.    Between at least 2002 and the present, and continuing, approximately twenty three (23) APC products offered on the GSA Advantage! website and on New Tech's own website for sale by New Tech to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products. Examples of these non-TAA compliant products are included in Exhibit 12.

135.    Between at least 2002 and the present, New Tech entered into thousands of

individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, New Tech's own website, and by other means, all in violation of the TAA and the TAA Clause in New Tech's MAS Contract.

136.     Had New Tech provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under New Tech's MAS Contract would not have occurred.

## XVIII.

## OFFICEMAX INCORPORATED

137.     Defendant Officemax Incorporated ("Officemax") entered into a MAS contract with GSA, contract number GS-14F0035K, in 1995 ("Officemax's MAS Contract").

138.     Officemax's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Officemax's MAS Contract with GSA, Officemax was required to comply with the TAA.

139.     At the time of contract award and on occasions thereafter, Officemax agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

140.     Pursuant to Officemax's MAS Contract, between at least 2002 and the present, and continuing, Officemax offered for sale a number of office products to United States agencies via GSA Advantage! website, Officemax's own website, and by other means.

141.     Officemax falsely represented on the GSA Advantage! that the items offered for sale by Officemax to United States agencies under United Office Solutions' MAS Contract were TAA compliant products. Officemax knew these representations were false. Officemax either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations. The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin. Additionally, each of the products at issue and sold by the Officemax bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If

Officemax had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant. As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act. The APC products for which Officemax falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 13 (incorporated herein by reference).

142.    Between at least 2002 and the present, and continuing, approximately twenty seven (27) APC products offered on the GSA Advantage! website and on Officemax's own website for sale by Officemax to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products. Examples of these non-TAA compliant products are included in Exhibit 13.

143.    Between at least 2002 and the present, Officemax entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Officemax's own website, and by other means, all in violation of the TAA and the TAA Clause in Officemax's MAS Contract.

144.    Had Officemax provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Officemax's MAS Contract would not have occurred.

## XIX.

## PC MALL GOV, INC.

145.    Defendant PC Mall Gov, Inc. ("PC Mall Gov") entered into a MAS contract with GSA, contract number GS-35F5946H, in 1987 ("PC Mall Gov's MAS Contract").

146.    PC Mall Gov's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of PC Mall Gov's MAS Contract with GSA, PC Mall Gov was required to comply with the TAA.

147.    At the time of contract award and on occasions thereafter, PC Mall Gov agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in

non-designated countries such as China or the Philippines.

148.    Pursuant to PC Mall Gov's MAS Contract, between at least 2002 and the present, and continuing, PC Mall Gov offered for sale a number of office products to United States agencies via GSA Advantage! website, PC Mall Gov's own website, and by other means.

149.    PC Mall Gov falsely represented on the GSA Advantage! that the items offered for sale by PC Mall Gov to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  PC Mall Gov knew these representations were false.  PC Mall Gov either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the PC Mall Gov bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If PC Mall Gov had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which PC Mall Gov falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 14 (incorporated herein by reference).

150.    Between at least 2002 and the present, and continuing, approximately twenty (20) APC products offered on the GSA Advantage! website and on PC Mall Gov's own website for sale by PC Mall Gov to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 14.

151.    Between at least 2002 and the present, PC Mall Gov entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, PC Mall Gov's own website, and by other means, all in violation of the TAA and the TAA Clause in PC Mall Gov's MAS Contract.

152.    Had PC Mall Gov provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal

agencies on the GSA Schedule and the purchases of such items by Federal agencies under PC Mall Gov's MAS Contract would not have occurred.

## XX.

## SYNNEX CORPORATION

153.     Defendant Synnex Corporation ("Synnex") entered into a MAS contract with GSA, contract number GS-35F0143R, in 1980 ("Synnex's MAS Contract").

154.     Synnex's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Synnex's MAS Contract with GSA, Synnex was required to comply with the TAA.

155.     At the time of contract award and on occasions thereafter, Synnex agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

156.     Pursuant to Synnex's MAS Contract, between at least 2002 and the present, and continuing, Synnex offered for sale a number of office products to United States agencies via GSA Advantage! website, Synnex's own website, and by other means.

157.     Synnex falsely represented on the GSA Advantage! that the items offered for sale by Synnex to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  Synnex knew these representations were false.  Synnex either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the Synnex bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If Synnex had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which Synnex falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 15 (incorporated herein by reference).

158.    Between at least 2002 and the present, and continuing, approximately forty eight (48) APC products offered on the GSA Advantage! website and on Synnex's own website for sale by Synnex to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 15.

159.    Between at least 2002 and the present, Synnex entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Synnex's own website, and by other means, all in violation of the TAA and the TAA Clause in Synnex's MAS Contract.

160.    Had Synnex provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Synnex's MAS Contract would not have occurred.

## XXI.

## UNISTAR-SPARCO COMPUTERS, INC.

161.    Defendant Unistar-Sparco Computers, Inc. ("Unistar-Sparco") entered into a MAS contract with GSA, contract number GS-35F0218M, in 1992 ("Unistar-Sparco's MAS Contract").

162.    Unistar-Sparco's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Unistar-Sparco's MAS Contract with GSA, Unistar-Sparco was required to comply with the TAA.

163.    At the time of contract award and on occasions thereafter, Unistar-Sparco agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

164.    Pursuant to Unistar-Sparco's MAS Contract, between at least 2002 and the present, and continuing, Unistar-Sparco offered for sale a number of office products to United States agencies via GSA Advantage! website,Unistar-Sparco's own website, and by other means.

165.    Unistar-Sparco falsely represented on the GSA Advantage! that the items offered for sale by Unistar-Sparco to United States agencies under United Office Solutions' MAS Contract were

TAA compliant products.  Unistar-Sparco knew these representations were false.  Unistar-Sparco either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the Unistar-Sparco bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If Unistar-Sparco had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which Unistar-Sparco falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 16 (incorporated herein by reference).

166.    Between at least 2002 and the present, and continuing, approximately two hundred twenty four(224) APC products offered on the GSA Advantage! website and on Unistar-Sparco's own website for sale by Unistar-Sparco to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 16.

167.    Between at least 2002 and the present, Unistar-Sparco entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Unistar-Sparco's own website, and by other means, all in violation of the TAA and the TAA Clause in Unistar-Sparco's MAS Contract.

168.    Had Unistar-Sparco provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Unistar-Sparco's MAS Contract would not have occurred.

## XXII.

## WECSYS LLC

169.    Defendant Wecsys LLC entered into a MAS contract with GSA, contract number

GS-14F0039L, in 1990 ("Wecsys LLC's MAS Contract").

170.    Wecsys LLC's MAS Contract expressly incorporates and is subject to the requirements of the TAA. Throughout the life of Wecsys LLC's MAS Contract with GSA, Wecsys LLC was required to comply with the TAA.

171.    At the time of contract award and on occasions thereafter, Wecsys LLC agreed that, under its MAS Contract, it would only sell to the United States Government end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

172.    Pursuant to Wecsys LLC's MAS Contract, between at least 2002 and the present, and continuing, Wecsys LLC offered for sale a number of office products to United States agencies via GSA Advantage! website, Wecsys LLC's own website, and by other means.

173.    Wecsys LLC falsely represented on the GSA Advantage! that the items offered for sale by Wecsys LLC to United States agencies under United Office Solutions' MAS Contract were TAA compliant products.  Wecsys LLC knew these representations were false.  Wecsys LLC either explicitly knew their representation were false or, at a minimum, acted with reckless disregard and deliberate indifference for the truth or falsity of the representations.  The products at issue are purchased by the defendants from American Power Conversion ("APC"), whose website makes no mention of the products' origin.  Additionally, each of the products at issue and sold by the Wecsys LLC bears the insignia "Product of China" or "Made in Philippines" or a label from another non-TAA country. If Wecsys LLC had looked into the issue before falsely certifying that the APC products it was listing and selling were TAA compliant, it would have easily known the products were not TAA compliant.  As a result, the false representations as to the products' TAA compliance were made "knowingly" as that term is defined by the False Claims Act.  The APC products for which Wecsys LLC falsely certified TAA compliance and falsely billed as though they were TAA compliant are listed in Exhibit 17 (incorporated herein by reference).

174.    Between at least 2002 and the present, and continuing, approximately forty one (41) of the APC items offered on the GSA Advantage! website and on Wecsys LLC's own website for sale by Wecsys LLC to United States agencies originated in China, the Philippines or other non-designated countries, and were not TAA compliant products.  Examples of these non-TAA compliant products are included in Exhibit 17.

175.     Between at least 2002 and the present, Wecsys LLC entered into thousands of individual sales transactions totaling millions of dollars with Federal agencies whereby thousands of items that were falsely represented as being TAA compliant were sold to Federal agencies via the GSA Advantage! website, Wecsys LLC's own website, and by other means, all in violation of the TAA and the TAA Clause in Wecsys LLC's MAS Contract.

176.     Had Wecsys LLC provided accurate information about the countries of origin of these noncompliant items, such items would not have been eligible to be offered to Federal agencies on the GSA Schedule and the purchases of such items by Federal agencies under Wecsys LLC's MAS Contract would not have occurred.

## XXIII.
## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (False Claims Act, 31 U.S.C. § 3729(a)(1),(2) and (3) (1986) and 31 U.S.C. § 3729(a)(1)(A),(B) and (C) (2009))

177.     The *qui tam* Plaintiff realleges paragraphs 1-176, and they are incorporated herein by reference as if they were set forth in full.

178.     Between 2004 and the present, and continuing, A&T Marketing, Inc., Aprisa Technology LLC, Capitol Supply, Inc., CDW Government LLC, Dell Marketing L.P., Ellison Systems, Inc., En Pointe Gov, Inc., Gov Connection, Inc., GTSI Corp., Insight Public Sector, Inc., KPaul Properties, LLC, New Tech Solutions, Inc., Officemax Incorporated, PC Mall Gov, Inc., Synnex Corportation, Unistar-Sparco Computers, Inc. and Wecsys LLC each knowingly presented or caused to be presented to the United States false claims for payment of APC office supply products that each respective defendant falsely represented to GSA and Government purchasers to be TAA-compliant products and used false records to get false claims paid. Such claims and records were false because, as each of the respective defendants then knew, the APC products sold were not compliant with the TAA and had originated in non- designated countries, all in violation of the False Claims Act, 31 U.S.C. § 3729(a).

179.     As a result of each respective Defendant's knowingly presenting these false claims to the United States, and using false records and causing false claims to be presented, the United States paid the claims and has suffered damages in an amount to be determined at trial.

## XIV.
## PRAYER

WHEREFORE, the *Qui Tam* Plaintiff prays as follows:

180.    For treble damages and civil penalties up to the maximum permitted by law, for the maximum *qui tam* percentage share allowed by law, and for attorney's fees, costs and reasonable expenses; and

181.    For any and all other relief to which the plaintiff may be entitled.

## XV.
## JURY DEMAND

Plaintiff requests a trial by jury.


Dated:  August 31, 2012                           Respectfully submitted,


Dennis J. Whelan III   (DC Bar #451658)
2222 Monument Ave.
Richmond, VA 23220
djw@djwlegal.com
ph - (804) 359-4123  fax - (804) 359-4124
(Local Designated Counsel)


Donald R. Warren     (CA Bar  138933)
WARREN ■ BENSON Law Group
7825 Fay Ave, Ste 200
La Jolla, CA 92037
Tel: 858-454-2877
Fax: 858-454-5878
donwarren@warrenbensonlaw.com

Attorneys for Qui Tam Plaintiff