UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES *ex rel*
MATTHEW MACDOWELL,

    Plaintiff,

v.

SYNNEX CORPORATION,

    Defendant.

No. C 19-00173 WHA

**ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT; DENYING *DAUBERT* MOTION AND MOTION TO FILE UNDER SEAL.**

## INTRODUCTION

In this *qui tam* False Claims Act case, defendant moves for summary judgment asserting, in part, that relator is not an original source. Defendant also brings a *Daubert* motion to exclude relator's expert's report. Relator brings a motion to file under seal portions of his opposition to defendant's motion for summary judgment and corresponding exhibits attached thereto. For the following reasons, summary judgment is **GRANTED** in favor of defendant. Defendant's *Daubert* motion is **DENIED AS MOOT**. Relator's motion to file under seal is **DENIED**.

## STATEMENT

Relator Mathew MacDowell worked for United Office Solutions, Inc. — a competitor and authorized reseller of Synnex products — from 2007 to 2010.* Relator's job duties

---

* There is a discrepancy between the complaint and relator's deposition testimony. The complaint states relator

included following up with government agency customer representatives on contract solicitations. Through his job duties, relator learned that Synnex was awarded major sales contracts with federal agencies for the sale of APC products.

Defendant Synnex Corporation is an industry leading information technology distributor. Synnex sold IT products to the federal government through its Multiple Award Schedule, Schedule 70 ("MAS Schedule 70") contract with the General Services Administration. In 2006, Synnex entered into a contract with Huawei Technologies Co., Ltd., a Chinese technology corporation, to sell information technology infrastructure components in the United States. Synnex allegedly imported products manufactured by American Power Conversion Corporation ("APC") — currently known as Schneider Electric Corporation — containing parts manufactured by Huawei. From 2002 onward, Synnex allegedly offered for sale and sold hundreds of variations of electric power supply products to the government under their MAS Schedule 70 knowing that they contained parts from APC that were manufactured in China and the Philippines, countries that are non-designated countries under the Trade Agreements Act of 1979 ("TAA"), 19 U.S.C. §§ 2501–2581.

Relator filed this lawsuit in August 2012 in the United States District Court for the District of Columbia naming seventeen defendants. The complaint remained under seal while the government was granted nineteen extensions of time to consider intervention. In July 2017, the government declined to intervene in relator's case against Synnex but the action remained under seal pending the government's resolution of the matter with regard to the other defendants.

In December 2018, the District of Columbia court granted the parties' stipulated request to transfer the case here. In February 2019, all matters being resolved as to all defendants except Synnex, the government moved to unseal the case, allowing Synnex to be served with the complaint. In April 2019, relator filed a third amended complaint which Synnex moved to dismiss arguing that relator's complaint was based on two publicly disclosed federal lawsuits

---

worked for United Office Solutions from 2007–2009 (Dkt. No. 135 at ¶ 98) but in his deposition, relator testified he worked there from about 2008–2010 (Dkt. No. 158-2 at 19). Because it is helpful to relator's case, this order will assume relator worked at United Office Solutions from 2007–2010.

2

filed against it in 2006 and 2007, thereby triggering the Act's public disclosure bar. 31 U.S.C. § 3730(e)(4)(A).

A prior order took judicial notice of the complaints in the two previous lawsuits against Synnex, parsed through the allegations therein, and determined that the instant action was "substantially similar" to the other two lawsuits in that they too "alleged Synnex sold or offered for sale products through GSA that were in violation of the TAA" (Dkt. No. 114 at 4). Given the similarity of Synnex's alleged conduct in all three suits, the order ruled that the public disclosure bar applied, notwithstanding that those suits involved different products made by different manufacturers (*ibid*).

Nonetheless, because relator offered proof that he had direct and independent knowledge of the allegations in his complaint that appeared to materially add to the publicly disclosed allegations in the other two lawsuits, the order allowed relator's *qui tam* suit to proceed under the "original source" exception to the public disclosure bar, subject to later proof. Synnex's motion to dismiss the third amended complaint was nonetheless granted on the ground that it did not meet the particularity requirement of Rule 9(b). Thereafter, having alleged sufficient facts, a later order granted relator's motion to file the fourth and operative complaint (Dkt. No. 129).

The operative complaint alleges, in part (Dkt. No. 135 at ¶¶ 6–39) (footnote omitted):

> One material requirement of all GSA MAS Schedules 70, including Synnex's contracts, is compliance with the Trade Agreements Act ("TAA") and its related regulations. See 19 U.S.C. §§ 2501 et seq. The TAA requires that all products sold to the United States government be manufactured in certain designated countries deemed to trade fairly with the United States.
>
> These requirements are material for a host of reasons. They ensure that United States manufacturers and manufacturers in countries who trade fairly with the United States are rewarded. They also ensure that products from certain countries are not purchased and used by United States agencies, departments, and employees where those countries may pose special security risks to the United States. This second rational is especially vital in dealing with software or hardware products that will ultimately be connected to computers and networks within the United States government — the exact types of products Synnex sells to the United States.

3

> Synnex's GSA MAS Schedule 70 contracts expressly incorporate and are subject to the requirements of the TAA, 19 U.S.C. § 2501 et seq., and its related regulations. The TAA requires that all products sold to the United States Government be manufactured in designated countries deemed to trade fairly with the United States. See F.A.R. § 52.225-5. . . . The Trade Agreements Clause incorporated into Synnex's MAS contracts specifies the "designated countries" whose "end products" may be offered for sale under MAS Schedule 70 Contracts.
>
> This incorporation is accomplished via explicit reference in the contract to 48 C.F.R. §§ 52.225-5 and 52.225-6. Federal Acquisition Regulation section 52.225-5 identifies certain "designated countries" under the WTO GPA and provides that a contractor is prohibited from delivering products under the contract that are not exclusively made (or substantially transformed) in the United States or one of the designated countries. The products at issue in the Synnex's false claims were made, by way of example, in China and the Philippines, which are not TAA designated countries.
>
> \*     \*     \*
>
> GSA does not permit products from non-designated countries to be offered for sale on the GSA Advantage! website. GSA requires vendors to specifically list all products for sale and their countries of origin before the products can be approved for sale on the GSA Advantage! website. These requirements are mandatory for all vendors who seek to do business with the GSA, including Synnex.
>
> F.A.R. § 52.225-6, the Trade Agreements Certificate, further requires prospective GSA Schedule contractors to "certify that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product as defined in the clause of this solicitation entitled 'Trade Agreements.'" 48 C.F.R. § 52.225-6(a). Under subsection (b), the contractor must also list with particularity all of those end products that are not U.S.-made and/or were not produced in a designated country. . . .
>
> \*     \*     \*
>
> So that it could list these products on the GSA schedule, at the time of contract award and on occasions thereafter, Synnex agreed that, pursuant to its respective GSA MAS Schedule 70 Contracts, it would sell to the United States Government only end products that originated in designated countries, and that it would not sell end products that originated in non-designated countries such as China or the Philippines.

Relator goes on to allege that "between at least 2002 and the present, and continuing, scores of APC products offered for sale by Synnex to United States agencies originated in China or other non-designated countries and were not TAA compliant products" (*id.* at ¶ 48).

4

The complaint alleges a long list of specific sales of APC products allegedly manufactured in China and allegedly sold by Synnex to the government under Synnex's GSA Schedule contract in violation of the TAA requirement. The complaint also alleges that Synnex hides the fact that it is selling TAA non-compliant products to the government by "bundling" those products with services. Synnex allegedly also conceals the fact that it sells TAA non-compliant products to the government by labeling them "Infrastruxure Manager ("ISX")" products that Synnex misrepresents are substantially modified in the United States and therefore comply with the TAA. The complaint further alleges that Synnex knew the APC products it was selling to the government were made in China because Synnex imported those products directly from ports in China; the complaint provides a long list of records of imports and records of APC shipments from China made in 2014.

Discovery was completed and Synnex now moves for summary judgment arguing: (1) relator's testimony establishes that he is not an original source; (2) relator's claims based on transactions that occurred prior to August 31, 2006, are time barred; (3) relator cannot bring claims on behalf of medical facilities, educational institutions, or state and local governments; (4) relator's claims based on transactions that were not processed through Synnex's GSA contract fail; (5) relator cannot prosecute claims based on non-GSA contract transactions that Synnex mistakenly coded as GSA contract transactions; (6) Synnex's reliance on APC's representations as to the country of origin of its products preclude relator's fraud claim; and (7) where the TAA applies to services, the place of incorporation of the entity providing the services governs the country of origin inquiry (Dkt. No. 158).

Relator opposes, arguing, *inter alia*, that a new unpublished opinion by our court of appeals "warrants revisiting" the issue of whether the previous lawsuits trigger the public disclosure bar (Dkt. No. 160). Relator also moves to file under seal portions of his opposition and corresponding exhibits (Dkt. No. 159). According to relator, Synnex has designated these materials as "confidential" pursuant to their protective order. Lastly, Synnex brings a *Daubert* motion to exclude relator's expert's report. This order follows full briefing and oral argument and hereby resolves all motions.

**ANALYSIS**

**1.  SYNNEX'S MOTION FOR SUMMARY JUDGMENT.**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Prior to March 2010, the public disclosure bar to the False Claims Act, and the corresponding original source exception to the bar, read:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (2006).

In March 2010, the Patient Protection and Affordable Care Act amended the public disclosure bar and original source exception. Pub. L. No. 111-148, Title X, § 10104(j)(2), 124 Stat. 901 (2010). They now provide:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed —
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> **(ii)** in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> **(iii)** from the news media,

6

> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transaction in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4) (2012).

As noted, a prior order held that the public disclosure bar applies here, unless relator could show he is an original source, because relator's allegations are substantially similar to the allegations made in the Crennen and Folliard lawsuits filed in 2006 and 2007, respectively (Dkt. No. 114). That determination was made by parsing the allegations in the two prior complaints and comparing them with the allegations made in the present complaint. Relator argues that determination should be revisited in light of our court of appeals' intervening decision in *United States ex rel. Shahinian v. Kimberly-Clark Corp.*, 807 F. App'x 710 (9th Cir. 2020). This order declines to reconsider that ruling (1) on the basis of an unpublished memorandum opinion when (2) relator did not seek leave to move for reconsideration as required by Civil Local Rule 7-9. Therefore, the public disclosure bar applies here unless relator can show he is an original source of the information.

Our court of appeals has held that the 2010 amendments to the public disclosure bar and original source exception do not apply retroactively. *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1103 (9th Cir. 2017). Accordingly, this order will apply the pre-amendment version of the original source exception to alleged false claims made prior to the 2010 amendments and will apply the current version of the statute to claims made after the enactment of the amendments. Relator fails under both standards because there is a complete dearth of evidence in the record to show that relator is an original source under either the pre- or post-amendment versions of the Act.

To qualify as an original source under the pre-2010 version of the Act, a relator must show that he has direct and independent knowledge of the information on which his allegations

7

are based. "To have direct and knowledge under the statute, a person's knowledge must be firsthand, obtained through his own labor, and unmediated by anything else. The person must also have 'true knowledge,' as opposed to guesswork or suspicion . . . ." *Prather*, at 1104 (citations omitted). Importantly, at least under the pre-2010 version of the original source exception, "a relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." *Id.* at 1105 (citations omitted).

Except for internet research of public information after 2010, relator's only source of the information underlying his allegations was through his employment with United Office Solutions from 2007 to 2010. Relator's first experience "with GSA or TAA" was during his employment with United Office Solutions (*ibid.*), and he never inspected his employer's records of transactions that occurred before his employment (*id.* at 30). As part of his duties, relator would contact the GSA to find out who had won bids for solicitations his employer had lost (*id.* at 27). During the course of his employment, he learned that Synnex had sold IT products manufactured by APC to the government.

With respect to information relator gained during his employment, relator testified that he could not recall basic information about a transaction between his former employer and the government alleged in his complaint (*id.* at 17). He did not know whether or not open market transactions had to be TAA compliant (*id.* at 13–14), whether United Office Solutions only sold products to the government through the GSA (*id.* at 25–26), whether or not GSA contract holders like Synnex can make sales on the open market that are not part of a GSA purchase (*id.* at 8–9).

Relator testified that he saw an APC replacement car battery that had been shipped to United Office Solutions (*id.* at 21). That battery indicated that it was made in China (*ibid.*). Because he remembered the name "APC" as part of Synnex's offerings, and because he knew that GSA contracting required TAA compliance and that China is not a TAA compliant country, he started asking questions (*id.* at 21–22). He called a Synnex representative and asked: "are these made in China? Are they all made in China? Or they just make some things

in China?"; the Synnex employee responded: "Nope, they're all made in China" (*id*. at 22). To relator, "this seemed enormously large of a violation" based on his "very little" knowledge of GSA contracting (*ibid.*).

Furthermore, with respect to the documents attached to his complaint or produced in discovery, he either could not identify the documents, could not recall how he previously made determinations about the contents of the documents, or could not recall how he came to possess them (*id*. at 31–44). This is true for each of the documents relator was questioned about in his deposition. Synnex contends that many of the documents relator produced come from the Federal Procurement Data System website, www.fpds.gov (*see* Gainor Decl., Exhs. B–F); and several of them even bear indications that they were modified by the government as late as 2019 (*see, e.g.*, *id*. at Exh. B). Synnex thus contends that, contrary to relator's testimony, relator could not have produced these documents to the government in 2010. Relator's only response is to say that his inability to identify the source of each of over 31 spreadsheets that he was questioned upon during his deposition is of no probative value and that metadata of thirteen of the spreadsheets shows that they were created by United Office Solutions (Dkt. No. 160 at 13). That is incorrect. Relator bears the burden of producing evidence creating a genuine dispute that he has direct and independent knowledge of the information upon which he basis his allegations. His lack of knowledge goes to the heart of whether or not he is an original source and further reaffirms that his knowledge is limited and not independent of publicly disclosed information.

Finally, with respect to information of false claims relator gained after his employment with United Office Solutions, he had no access to information vis-à-vis his employer (Dkt. No. 158-2 at 28); he had no contact with Synnex or American Power Conversion (*id.* at 28–29); no contact with any relevant government personnel (*id.* at 29); and no contact with any of the seventeen defendants named in his original complaint (*ibid.*); his primary means of accessing information was his library card and the internet (*id.* at 28).

As the foregoing demonstrates, relator raises no genuine dispute that he has direct and independent knowledge of the information underlying his complaint; in fact, he points to no

evidence at all supporting such a contention. Even as to relator's most specific and persuasive testimony as to one particular transaction, his testimony reveals his knowledge is speculative and secondhand (Dkt. No. 158-2 at 25–26):

> Q: Were any of the batteries that — or other products that were involved in your claim against UOS [United Office Solutions] the same as the products that are involved in this lawsuit?
>
> A: Yes.
>
> Q: And how do you know that?
>
> A: They have both the same APC part number and internal Synnex part number.
>
> Q: Okay. And were the batteries at UOS that you're talking about, were those being sold through the GSA Schedule only?
>
> A: I don't recall. And you say "batteries," it was one battery that triggered this conversation [with Synnex representatives], one physical kind of car battery.
>
> Q: Okay. So let me talk more broadly then. Were the products that UOS was selling only being sold through a GSA Schedule? And when I say the "products," I'm talking about the — the Synnex-derived products.
>
> A: I — I believe so at the time. I don't know the answer to that. I think that there are different contracting vehicles that could have been used. To the best of my recollection, yes.

Importantly, the sales at issue in the above exchange were resales by relator's then-employer to the federal government of "Synnex-derived" products, not direct resales by Synnex to the federal government. Even as to those sales, relator's knowledge whether they were made under United Office Solution's GSA Schedule contract is speculative, making his knowledge about *Synnex's* sales of the APC batteries to the federal government all the more speculative.

The result is the same under the current version of the original source rule. To qualify as an original source under the Act as amended in 2010, an individual must either (i) prior to a public disclosure, voluntarily disclose to the Government the information on which his allegations are based, or (ii) have knowledge that is independent of and materially adds to the publicly disclosed allegations and voluntarily provide the information to the Government

10

before filing an action. 31 U.S.C. § 3730(e)(4)(B). Relator does not satisfy the first test because he did not disclose the basis of his allegations to the government prior to the public disclosure of the substantially similar allegations in the 2006 Crennen complaint and 2007 Folliard complaint.

Relator does not satisfy the second test because there is no evidence that his knowledge is independent of prior public disclosures. With respect to information he gained after his employment at United Office Solutions, relator conceded that his primary source of information was the internet, "Google, stuff like that, YouTube" (Dkt. No. 158-2 at 28). Therefore, there is no dispute that with respect to allegations based on information relator gained after his employment with United Office Solutions, relator is not an original source.

This leaves only those allegations of false claims made after the enactment of the amendments in March 2010 but before relator left his employment at United Office Solutions at the end of 2010. Again, relator bears the burden to raise some triable issue of fact that his knowledge of such allegations is independent of public disclosures. Relator was unable to identify how he came into possession of *any* of the documents he was questioned about during his deposition, and he could not recall whether the transaction identified at paragraph 101 of his complaint was a GSA Schedule transaction requiring TAA compliance, which is the crux of his theory of liability. These failures are fatal to relator's case.

Relator's failure of recollection is understandable given that the transactions that are the subject of the present complaint occurred more than ten years ago. As relator stated: "I don't recall. I really — I really don't recall. . . . It's ten years ago. . . . I've had three kids in ten years. A lot has changed" (Dkt. No. 185-2 at 36–37). No doubt this is true, but it does not change the fact that the burden is on relator to come forward with some evidence showing he is an original source of the information underlying his allegations. The record shows he cannot.

Therefore, summary judgment is **GRANTED** in favor of defendant on the ground that relator is not an original source and, therefore, his claims are barred by the public disclosure bar. This being dispositive, this order does not reach the other arguments raised by Synnex.

11

Because Synnex's motion for summary judgment is granted, its *Daubert* motion is **DENIED** as moot.

### 2. RELATOR'S MOTION TO FILE UNDER SEAL.

In this circuit, courts start with a "strong presumption in favor of access" when deciding whether to seal records. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citation omitted).

In connection with his opposition to Synnex's motion for summary judgment, relator filed an administrative motion to file under seal portions of his opposition (*see* Opp. at 15, 16, 18) and exhibits L, O, P, T, U, and X to the declaration of Justin Berger (Dkt. No. 159). Sealing is requested on the sole basis that Synnex has designated all these materials as "confidential" pursuant to the parties stipulated protective order. Synnex, however, failed to file a supporting declaration as required by Civil Local Rule 79-5(e). Accordingly, relator's motion to seal is **DENIED**.

### CONCLUSION

Because the record establishes there is no genuine dispute that relator is not an original source under the False Claims Act, summary judgment is **GRANTED** in favor of defendant.

**IT IS SO ORDERED.**

Dated: March 26, 2021

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE